## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| Pharmaceutical Research and Manufacturers of America, <br><br> *Plaintiff,* <br><br> v. <br><br> Stuart Williams, Stacey Jassey, Mary Phipps, Andrew Behm, James Bialke, Amy Paradis, Rabih Nahas, Samantha Schirmer, and Kendra Metz, in their official capacities as members of the Minnesota Board of Pharmacy, <br><br> *Defendants.* | Case No. 0:20-cv-01497-DSD-DTS |

**BRIEF OF THE NATIONAL ASSOCIATION OF MANUFACTURERS AND THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Jeremy C. Marwell
   (*pro hac vice pending*)
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC  20037
(202) 639-6507
Email: jmarwell@velaw.com

Thomas H. Boyd, #0200517
David A. Aafedt, #027561X
WINTHROP & WEINSTINE, P.A.
Capella Tower | Suite 3500
225 South Sixth Street
Minneapolis, MN 55402
(612) 604-6400
Email: tboyd@winthrop.com
Email: daafedt@winthrop.com

*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

**Page**

Table Of Authorities .............................................................................. iii

Identity And Interest Of *Amici Curiae* ....................................................1

Introduction And Summary Of Argument................................................2

Argument ..................................................................................................5

    I.     The Act Is Unconstitutional Under The *Per Se* Takings Doctrine, And Any Attempt To Distinguish Or Dilute That Doctrine Would Risk Serious Negative Effects On Property Rights....................................5

         A.     The *Per Se* Takings Rule Is An Important Bulwark For Private Property Rights. ....................................................5

         B.     The Act Is Flatly Unconstitutional Under *Horne*'s Bright-Line *Per Se* Takings Rule. ............................................8

    II.    The State's Rationale For Defending The Act Would, If Accepted, Impermissibly Allow States To Take Private Property In A Broad Range Of Contexts. ................................................................13

Conclusion ..............................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Cases:**                                                                                        **Page(s)**

*Ark. Game & Fish Comm'n v. United States*,
    568 U.S. 23 (2012)........................................................................6

*Armstrong v. United States*,
    364 U.S. 40 (1960)................................................................. 12, 13

*Biotechnology Indus. Org. v. District of Columbia*,
    496 F.3d 1362 (Fed. Cir. 2007) .........................................................19

*Cherokee Nation v. S. Kan. Ry. Co.*,
    135 U.S. 641 (1890)......................................................................11

*E. Enters. v. Apfel*,
    524 U.S. 498 (1998)....................................................................6, 7

*Haw. Housing Auth. v. Midkiff*,
    467 U.S. 229 (1984)......................................................................11

*Horne v. Dep't of Agric.*,
    576 U.S. 350 (2015)................................................................ *passim*

*Innovair Aviation, Ltd. v. United States*,
    632 F.3d 1336 (Fed. Cir. 2011) .........................................................14

*Innovair Aviation, Ltd. v. United States*,
    72 Fed. Cl. 415 (2006) ..................................................................14

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013)......................................................................11

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994).......................................................................5

*Lee v. City of Chicago*,
    330 F.3d 456 (7th Cir. 2003) ...........................................................14

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)................................................................ *passim*

**Cases—Continued:**                                                            Page(s)

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992)................................................................. 6, 7, 8

*Milwaukee & Suburban Transp. Corp. v. Milwaukee Cty.*,
    263 N.W.2d 503 (Wis. 1978)....................................................... 14, 16

*Nixon v. United States*,
    978 F.2d 1269 (D.C. Cir. 1992)................................................... 15, 19

*Penn Cent. Transp. Co. v. New York City*,
    438 U.S. 104 (1978)..........................................................................6

*Se. Pa. Transp. Auth. v. Gilead Sci., Inc.*,
    102 F. Supp. 3d 688 (E.D. Pa. 2015).................................................19

*Seery v. United States*,
    161 F. Supp. 395 (Ct. Cl. 1958).......................................................15

*Store Safe Redlands Assocs. v. United States*,
    35 Fed. Cl. 726 (1996) ..................................................................12

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    535 U.S. 302 (2002)........................................................................7

*United States v. General Motors Corp.*,
    323 U.S. 373 (1945)......................................................................15

*United States v. Russell*,
    80 U.S. 623 (1871).......................................................................14

*Yee v. City of Escondido*,
    503 U.S. 519 (1992)............................................................... 7, 8, 12

**Constitutional Provisions:**

U.S. Const. amend. V.......................................................................3

U.S. Const. amend. XIV ...................................................................3

**Statutes:**

Minn. Stat. Ann. § 151.74 (West 2020)................................................2

**Other Authorities:**                                                                   **Page(s)**

Fiona M. Scott Morton, *The Problems of Price Controls*, Regulation,
    Spring 2001, at 50, https://bit.ly/3i19Z4a ........................................... 18

Guido Calabresi & A. Douglas Melamed, *Property Rules, Liability
    Rules, and Inalienability: One View of the Cathedral*,
    85 Harv. L. Rev. 1089 (1972) ................................................................. 17

Jennifer Gish, *$200 State Grants for School Supplies*, Times Union
    (Aug. 12, 2009), https://bit.ly/3kMQbDu .............................................. 18

Michael W. McConnell, *The Raisin Case*,
    2015 Cato Sup. Ct. Rev. 313 (2015) .............................................. 16, 17

Minn. Dep't of Human Servs., *Minnesota Food Assistance Program
    (MFAP)*, https://bit.ly/2EzTO06 ........................................................... 18

Roscoe Pound, *Interpretations of Legal History*
    (Peter Smith 1967) (1923) ...................................................................... 5

Solar Energy Indus. Ass'n, *What Rebates and Incentives Are
    Available for Solar Energy?*, https://bit.ly/3mRhxu0 ........................... 18

Steven N. Berger, Note, *Access for CATV Meets the Taking Clause:
    The Per Se Takings Rule of* Loretto v. Teleprompter Manhattan
    CATV Corp., 25 Ariz. L. Rev. 689 (1983) .............................................. 8

Susan Rose-Ackerman, *Against Ad Hocery: A Comment on
    Michelman*, 88 Colum. L. Rev. 1697 (1988) ............................... 7, 8, 12

Truth in Accounting, *Financial State of the States 2020* (Sept. 22,
    2020), https://bit.ly/2FOaFwR .............................................................. 17

## IDENTITY AND INTEREST OF *AMICI CURIAE*

The National Association of Manufacturers ("NAM") and the Chamber of Commerce of the United States of America ("Chamber") submit this brief in support of plaintiff, the Pharmaceutical Research and Manufacturers of America ("PhRMA").[1]  The NAM is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states.  The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.  The Chamber is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.

As preeminent national business and trade associations, *amici* have a strong interest in, and can offer a unique perspective on, the issues in this case.  American businesses rely on stable, fair, and predictable property rules—including in the area of takings law—and *amici* believe this brief will provide helpful perspective to the

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party contributed money intended to fund the preparation or submission of this brief.  No person other than *amici curiae*, their members, or their counsel contributed money intended to fund the preparation or submission of this brief.

Court on how the resolution of this case, and the key legal principles at issue here, will affect American businesses more broadly.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As PhRMA explains, the newly enacted Minnesota law at issue here—the Alec Smith Insulin Affordability Act ("Act"), Minn. Stat. Ann. § 151.74 (West 2020)—seeks to achieve a laudable policy goal of improving access to insulin, but does so through the clearly unconstitutional means of ongoing, *per se* takings of PhRMA's members' property without just compensation. Pl.'s Mem. Opp'n Mot. to Dismiss and Supp. Mot. for Summ. J. 38-41 (Doc. 27) ("PhRMA Summ. J. Mem."). In addition, the legal theories on which the State relies to defend its statute depart from existing black-letter law and have broad implications for private property rights nationwide, raising issues of grave concern to manufacturers, businesses, and property owners of all kinds. Accordingly, the NAM and the Chamber submit this brief to explain why this case has implications well beyond the pharmaceutical industry, and in particular to show why businesses in virtually all sectors of the U.S. economy would be harmed if this Court accepted Minnesota's novel and untenable stance on the scope of the Takings Clause.

Private enterprise cannot flourish if government may take private property whenever and on whatever terms it pleases. The Constitution recognizes this by providing that if the government takes private property, it *must* pay "just

2

compensation."  U.S. Const. amends. V, XIV.  Here, the Act imposes takings of the most straightforward kind: *per se* takings that require manufacturers to hand over, and give up all rights to, physical goods they own, on penalty of severe and increasing penalties.  *See* Compl. ¶ 76 (Doc. 1).  At the same time, Minnesota has not only failed to provide for compensation in the Act, but insists it is not constitutionally required to do so.  *See, e.g.*, Defs.' Mem. Supp. Mot. to Dismiss 11 (Doc. 16) ("disput[ing]" that the Act "result[s] in a 'taking'").  That striking and doctrinally indefensible legal position, if accepted, would have severe negative consequences for private property rights nationwide, including for businesses operating in every industry.

1.    A ruling that the Act does not result in *per se* takings would be inconsistent with binding Supreme Court precedent and would introduce uncertainty into takings jurisprudence that would have serious implications for property owners. The *per se* takings doctrine creates a clear, bright-line rule governing cases that fall within the heartland of takings law—the clarity of which stands in stark contrast to the *ad hoc*, circumstance-specific tests that courts apply when evaluating laws that fall short of *per se* takings.  The Supreme Court recently reaffirmed and clarified the *per se* takings rule in *Horne v. Department of Agriculture*, 576 U.S. 350 (2015), a case involving a government program with striking (and legally dispositive) parallels to the Act.  Here, however, Minnesota resists the conclusion that the Act imposes

3

*per se* takings, even though it requires manufacturers to give up their property entirely and without any compensation. The state's position is inconsistent with *Horne* and black-letter *per se* takings doctrine—the one clear lodestar in a too-often murky and uncertain area of law. The clarity and rigor of the *per se* takings rule provides critical protection for all property owners, especially businesses that rely on clear property rights in investing in research and development and other economically beneficial activities; under *Horne*, that bright-line rule applies here.

2.      The *per se* takings doctrine prevents the kinds of negative practical consequences for businesses, and especially manufacturers, across the country, that would otherwise occur under laws like the Act. To be sure, the Act itself is concerned with a specific subject, *i.e.*, insulin. But as decades of case law illustrate, government takings of personal property have not been limited to any particular subject matter or industry, and history shows the importance of maintaining a clear and robust *per se* takings doctrine for businesses of all kinds. Moreover, if Minnesota could provide insulin to its citizens by the simple expedient of appropriating it from manufacturers without compensation, other states could seek to do the same with respect to a broad range of other goods that may serve the policy goals of those states—and provide a ready-made template for doing so. Given the obvious incentives states have to find ways to provide benefits for their citizens *without* having to pay for them, applying the *per se* takings rule in this case will also

4

ensure that other jurisdictions do not target businesses across countless industry sectors for uncompensated appropriations of the goods they produce.

## ARGUMENT

**I.    The Act Is Unconstitutional Under The *Per Se* Takings Doctrine, And Any Attempt To Distinguish Or Dilute That Doctrine Would Risk Serious Negative Effects On Property Rights.**

    A.    The *Per Se* Takings Rule Is An Important Bulwark For Private Property Rights.

When it comes to property rights, "predictability and stability are of prime importance." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 271 (1994); *see also* Roscoe Pound, *Interpretations of Legal History* 154 (Peter Smith 1967) (1923) ("In matters of property and commercial law," "security of acquisitions and security of transactions" have "controlling" importance). The special importance of predictability and stability, though applicable to property and commercial law in general, has particular force in the area of takings law: property owners can only rely on the bedrock constitutional guarantee of just compensation for involuntary takings if there is doctrinal clarity about what constitutes a "taking" in the first place.

This case concerns one of the most important bulwarks of clarity and stability in takings jurisprudence: the *per se* takings rule articulated in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), and recently reaffirmed and clarified in *Horne v. Department of Agriculture*, 576 U.S. 350 (2015). Under the *per se* takings rule, the government has a "categorical duty to pay just

compensation" for "physical taking[s] of property," *i.e.*, "direct appropriations" where property is "actually occupied or taken away." *Horne*, 576 U.S. at 358, 361-62. Although this rule has its origins in much older case law, *see Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (canvassing prior cases), the Supreme Court emphatically rearticulated and reaffirmed it in *Horne*, notably clarifying that the *per se* takings rule is "equally applicable" to both real and personal property. *Horne*, 576 U.S. at 360.

The *per se* takings rule is a "fundamental" "guide . . . in [the Supreme Court's] Takings Clause jurisprudence." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012). Crucially, the rule provides a bedrock of clarity for property owners, standing as one of the "few invariable rules" that the Supreme Court has recognized in an area of constitutional law otherwise subject to considerable uncertainty. *Id.* at 31. Outside the context of the bright-line *per se* takings rule, "most takings claims turn on situation-specific factual inquiries," *id.* at 32, typically governed by the "essentially ad hoc" balancing test articulated and applied in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978); *see also E. Enters. v. Apfel*, 524 U.S. 498, 523-24 (1998) (plurality opinion). By design and practical effect, that balancing test—used to identify so-called "regulatory takings" that, despite not effecting *per se* takings, restrict the use of private property so severely that they nonetheless must be recognized as compensable takings—requires

courts to undertake "complex factual assessments of the purposes and economic effects of government actions," *Yee v. City of Escondido*, 503 U.S. 519, 523 (1992).

The fact-specific balancing approach applicable to government actions that fall short of *per se* takings stems from the pragmatic concern that subjecting "regulations prohibiting private uses [of property]" to a categorical takings rule "would transform government regulation into a luxury few governments could afford." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323-24 (2002). But the regulatory takings test has, in practice, become a famously difficult problem. Due to the vagueness inherent in the balancing approach used for regulatory takings, "[c]ases attempting to decide when a regulation becomes a taking are among the most litigated and perplexing in current law." *Apfel*, 524 U.S. at 541 (Kennedy, J., concurring in the judgment and dissenting in part). And whatever the merits of such an approach in applying the Takings Clause to regulations that merely affect the *use* of property, it gives "little insight into when, and under what circumstances" government action will be recognized as a compensable taking. *Lucas*, 505 U.S. at 1015. This "ad hoc balancing" yields "special difficulties in the takings area because of the important role of investment-backed expectations" in a system of commerce based on private property. Susan Rose-Ackerman, *Against Ad Hocery: A Comment on Michelman*, 88 Colum. L. Rev. 1697, 1697 (1988).

7

By contrast, the duty of governments to pay just compensation for any and all *per se* takings remains a "clear rule," *Yee*, 503 U.S. at 522-23, and a "ray of light in the otherwise shadowy area of takings law," Steven N. Berger, Note, *Access for CATV Meets the Taking Clause: The Per Se Takings Rule of* Loretto v. Teleprompter Manhattan CATV Corp., 25 Ariz. L. Rev. 689, 703 (1983) (internal quotation marks omitted).  As a result of its clarity and firmness, the *per se* takings rule allows property owners to make investments based on concrete expectations about the risk of government interference.  Owners are secure in the knowledge that *any* physical occupation or appropriation of their property by the government is a compensable taking—regardless of its scope or extent, *see Loretto*, 458 U.S. at 438 n.16, and "no matter how weighty the public purpose behind it," *Lucas*, 505 U.S. at 1015.  Property owners can therefore "confidently . . . commit resources to capital projects," assured that the fruits of their investments will not be subject to uncompensated appropriation by the government.  Rose-Ackerman, 88 Colum. L. Rev. at 1700. Protecting the coherence and vitality of the *per se* takings rule is accordingly crucial to ensuring that takings jurisprudence retains a clear, predictable core that protects investment-backed expectations and allows private enterprise to flourish.

 B. <u>The Act Is Flatly Unconstitutional Under *Horne*'s Bright-Line *Per Se* Takings Rule.</u>

Minnesota's legal stance in this case—that the Act does not result in takings of PhRMA's members' property—is foreclosed by *Horne*, as PhRMA explains.  *See*

8

PhRMA Summ. J. Mem. at 38-41.  Minnesota "dispute[s]" that the Act will "result in a taking," Defs.' Mem. Supp. Mot. to Dismiss 11 (internal quotation marks omitted); *see also id.* at 2, 8, 11-12, 19-20, 26, 30 (referring to "alleged" taking), even though the Act by its terms requires manufacturers to relinquish ownership of their goods to individuals meeting certain qualifications, without any statutory provision for compensation.  That extreme stance improperly asks this Court to ignore binding precedent and can be rejected on that basis, because there is no colorable ground to distinguish *Horne*.  Even if it were open to the Court to accept the State's position, such arguments inappropriately seek to muddy the salutary *per se* takings rule, ignoring the benefits of clarity and stability that rule provides to all property owners.  There is no way to distinguish the Act from the government program at issue in *Horne*, and numerous other laws that historically have presented no less a threat to private property rights, without ignoring binding precedent and doing serious violence to the bright-line *per se* takings rule, undermining the most important benefit that rule provides: its predictability, clarity, and stability.

This case is on all fours with *Horne*.  In *Horne*, the federal government required raisin growers "to give a percentage of their crop to the Government, free of charge," according to allocations "determined by the Raisin Administrative Committee."  576 U.S. at 354.  Raisin growers challenged this scheme as a *per se* taking without just compensation.  The Court agreed, holding that the government's

program effected a "clear physical taking" because "[a]ctual raisins are transferred from the growers to the Government," and growers "los[t] the entire 'bundle' of property rights in the appropriated raisins." *Id.* at 361.[2]  The Court rejected the argument that the government had merely imposed a constitutionally permissible "condition" on "participat[ing] in the raisin market," noting that it had rejected similar "condition" theories in the past. *Id.* at 364-65 (citing *Loretto*, 458 U.S. at 439 n.17).  And the Court rejected the suggestion that there was no taking simply because, in theory, the Government could achieve similar ends by different means, such as "a regulatory limit on production": as the Court explained, "[t]he Constitution . . . is concerned with means as well as ends." *Id.* at 362.

As PhRMA explains, the Act is a taking under the holding and rationale of *Horne*.  PhRMA Summ. J. Mem. 38-41.  In addition, it bears keeping in mind the broader doctrinal—and, for American businesses, practical—implications of any contrary holding.  This case, like *Horne*, involves an actual state-mandated transfer of physical goods without compensation.  Manufacturers "lose the entire 'bundle' of property rights in the appropriated" products. *Horne*, 576 U.S. at 361.  Those who do not comply are subject to severe monetary sanctions. *Compare* Compl. ¶ 76, *with*

---

[2] In fact, *Horne* involved a wrinkle *not* present here—namely, that the raisin growers (unlike insulin manufacturers under the Act) retained a theoretical "interest in any net proceeds from sales" of the appropriated goods by the government. *Horne*, 576 U.S. at 355.  In that respect, this is an *easier* case than *Horne*.

*Horne*, 576 U.S. at 356 (discussing civil penalties imposed on non-complying raisin growers).   And while the Act, like almost any taking, could be theoretically characterized as a "condition" on participating in entirely lawful and normal activities—here, selling insulin in Minnesota—the same (faulty) argument was made and rejected in *Horne*, 576 U.S. at 364-65.

Nor does it matter that this case, unlike *Horne*, involves a transfer of property to other private parties rather than the state itself, or that (under one of the Act's two programs) manufacturers have the "option" to reimburse pharmacies rather than supplying physical insulin.   While the Constitution allows government-mandated transfers of property from one private owner to another, *see Cherokee Nation v. S. Kan. Ry. Co.*, 135 U.S. 641, 657-58 (1890), such transfers *remain takings*, triggering the same constitutional duty to "mak[e] just compensation to the owner," *id.* at 658; *accord* PhRMA Summ. J. Mem. 40 (citing *Loretto*, 458 U.S. at 421, 430); *see also Haw. Housing Auth. v. Midkiff*, 467 U.S. 229, 245 (1984).   And a state cannot nullify the Takings Clause by giving property owners the "option" to pay the state for the privilege of not being subjected to uncompensated *per se* physical takings.   *See* PhRMA Summ. J. Mem. 41 (citing *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 611-12 (2013)).

In short, the Act falls squarely within the *per se* takings rule and is unconstitutional under *Horne*.   Any conceivable distinctions that the State may

offer—whether grounded in the nature of the product, the purpose of the legislation, or the details of the "conditions" that must be satisfied to trigger the obligation to surrender goods—are not relevant under *Horne*'s holding and rationale.

At bottom, this is a straightforward case involving legislation that "actually takes title" away from property owners, *Yee*, 503 U.S. at 522—i.e., "seizes or does the equivalent of seizing the property" and gives it to others, *Store Safe Redlands Assocs. v. United States*, 35 Fed. Cl. 726, 728 (1996).  "[E]very possible element of a Fifth Amendment 'taking'" is present, with the manufacturers losing any interest in the goods they are required to relinquish—"not because their property vanished into thin air," but because Minnesota has required them to turn it over "for [the public] advantage." *Armstrong v. United States*, 364 U.S. 40, 48 (1960).  This Court should give effect to the Supreme Court's clear holding that there is a "categorical duty" to pay just compensation in such circumstances. *Horne*, 576 U.S. at 358.  Any other outcome is inconsistent with the *per se* takings rule, and would introduce unnecessary confusion into an area of law where "clearly articulated, formal" rules are far "superior to open-ended" legal tests that depend on minute distinctions which property owners cannot predict *ex ante*.  Rose-Ackerman, 88 Colum. L. Rev. at 1697.

## II.    The State's Rationale For Defending The Act Would, If Accepted, Impermissibly Allow States To Take Private Property In A Broad Range Of Contexts.

Failure to enforce the *per se* takings doctrine in this case could seriously undermine the property rights of businesses, and especially manufacturers, in a broad range of contexts.  No matter how laudable the Act's goal—which Minnesota could have accomplished through any number of constitutionally sound mechanisms, *cf.* Compl. ¶ 2—"[t]he Constitution . . . is concerned with means as well as ends."  *Horne*, 576 U.S. at 362.  And a decision in Minnesota's favor on the question of whether the Act results in *per se* takings would threaten the property rights of manufacturers and other businesses across virtually every industry sector.  *Accord* Compl. ¶ 7.  The Supreme Court has repeatedly articulated and enforced the *per se* takings rule of *Loretto* and *Horne*.  This Court should apply that well-settled law.  A contrary decision would not only be contrary to binding precedent, but would encourage states to reframe traditional "takings" in an effort to avoid paying just compensation, and improperly allow the "Government [to] forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Armstrong*, 364 U.S. at 49.

Federal and state case reporters are replete with examples of government appropriation or occupation of personal property, highlighting the important and continuing role of the *per se* takings rule in protecting property rights.  For example,

13

in *Milwaukee & Suburban Transport Corp. v. Milwaukee County*, 263 N.W.2d 503, 508 (Wis. 1978), Milwaukee County condemned the assets of a private bus system and began operating the system under public ownership; all parties agreed that just compensation was required, and the only dispute was the exact amount. In *Lee v. City of Chicago*, 330 F.3d 456, 458-59 (7th Cir. 2003), police impounded an innocent bystander's private vehicle for investigation and spray-painted large inventory numbers on it.[3] Similarly, the plaintiff in *Innovair Aviation, Ltd. v. United States*, 72 Fed. Cl. 415 (2006), *rev'd on other grounds*, 632 F.3d 1336 (Fed. Cir. 2011), was completing the turboprop conversion of certain airplanes that were under contract to Air Colombia when the government seized the planes, claiming Air Colombia was a front for drug cartels; the court held that the seizure was a *per se* taking of the plaintiff's property. 72 Fed. Cl. at 416-18, 422. These are not isolated examples; indeed, reported cases involving commandeering of vehicles by government authorities go back to the Civil War: in *United States v. Russell*, 80 U.S. 623 (1871), "[t]hree steamboats . . . were impressed into the public service and employed as transports for carrying government freight," *id.* at 628-29.

---

[3] Although the case was not litigated on takings grounds, Judge Wood concluded that the plaintiff had "suffered [a] . . . taking: governmental authorities physically took some of his personal property for a public purpose and kept it for a period of time." *Lee*, 330 F.3d at 474 (Wood, J., concurring).

Other cases have involved everything from business equipment to household goods. In *United States v. General Motors Corp.*, 323 U.S. 373, 381, 383-84 (1945), the Supreme Court held that business equipment destroyed or depreciated as part of a temporary government takeover of a General Motors warehouse in Chicago triggered a duty of just compensation. In *Seery v. United States*, 161 F. Supp. 395 (Ct. Cl. 1958), the United States took a variety of household goods when the Army commandeered an opera singer's "castle-like villa" as an officers' rest home during and after World War II—again triggering a duty of just compensation for such *per se* takings, *id.* at 396-97, 399. And in *Nixon v. United States*, 978 F.2d 1269 (D.C. Cir. 1992), the D.C. Circuit agreed with former President Richard Nixon that a law depriving him of control over his presidential papers (albeit providing for the return of papers lacking "general historical significance," *id.* at 1272) was a *per se*, compensable taking—because it "physically dispossessed" him of the papers and foreclosed "his right to exclude others" and "dispose of the property" as he wished, *id.* at 1287. The diversity of reported cases illustrates the nearly limitless range of situations (often quite difficult to anticipate) in which the government may seek to appropriate private property for public use—and demonstrates the importance of a clear *per se* takings rule that provides assurance to all property owners that their goods will not be taken without just compensation.

There can be no doubt that under the State's (incorrect) view of takings doctrine—or any other decision attempting to distinguish the on-point *per se* takings precedents—other governments would rationally respond by enacting laws or restructuring existing ones to avoid the duty to pay just compensation. For example, a local government seeking to make a privately operated bus system more accessible (*cf. Milwaukee Cty.*, 263 N.W.2d 503) might simply require the bus operator to surrender tickets for distribution to individuals meeting certain criteria, rather than running a subsidy program out of public funds. Similarly, the program challenged in *Horne* could be restructured to look more like Minnesota's Act—*e.g.*, by requiring growers to set up and administer programs for giving raisins directly to "exporters," "foreign governments," "charitable causes," or other growers according to certain defined formulae, rather than (as actually occurred) requiring the growers to surrender the raisins to a government entity for similar uses. *Horne*, 576 U.S. at 354. Under Minnesota's view of the law, even takings of "vehicles, food, . . . and supplies" of the sort that "likely . . . led to the Takings Clause" might be achieved without compensation by requiring manufacturers to administer programs to provide such goods to state employees in defined circumstances. Michael W. McConnell, *The Raisin Case*, 2015 Cato Sup. Ct. Rev. 313, 323 (2015); *see also Horne*, 576 U.S. at 358-59 (describing origins of Takings Clause).

16

The risk of creating such bad incentives is particularly acute because the Act is, at bottom, a *de facto* safety net program with the basic goal of providing goods to individuals who may otherwise have difficulty paying for them. *See* McConnell, 2015 Cato Sup. Ct. Rev. at 320 (noting that "government is more likely to invade property rights if it thereby gains control over valuable resources that can be redistributed," as opposed to "value-destroying" takings where property is damaged or otherwise rendered inherently less valuable). The *per se* takings doctrine does and must apply with no less force to laws of this nature.

Typically, and appropriately, state programs designed to make goods available to citizens at reduced or no cost are paid for through public funds—whether the state buys goods and distributes them itself, reimburses private individuals' purchases, or uses a system of tax credits. The *per se* takings doctrine ensures this outcome, imposing a legal duty of just compensation that effectively requires states to "buy" the goods in question (albeit not necessarily in a voluntary exchange).[4] But states naturally have incentives—financial, political, or otherwise—to avoid bearing the costs of such public programs, or disguise their true costs to the public. *See* Truth

---

[4] In economic terms, a system that gives governments eminent domain power but requires them to pay just compensation (defined as market price) differs from a normal private market only by allowing governments to "force a sale." *See, e.g.*, Guido Calabresi & A. Douglas Melamed, *Property Rules, Liability Rules, and Inalienability: One View of the Cathedral*, 85 Harv. L. Rev. 1089, 1093, 1108, 1110 (1972).

17

in Accounting, *Financial State of the States 2020* at 4, 21 (Sept. 22, 2020), https://bit.ly/2FOaFwR (finding that "39 states d[o] not have enough money to pay all of their bills," with "total debt of the 50 states amount[ing] to $1.4 trillion"). If the Act were upheld and found not to result in compensable takings under the Fifth Amendment, states would be given a powerful new tool for doing so—simply require manufacturers to give up their goods without compensation.

Indeed, if the Act were upheld as not resulting in compensable takings, it would encourage states to restructure other state programs—essentially, any program designed to make goods available to citizens at zero or reduced cost—in a way that allows the state to avoid, or at least appear to avoid,[5] the costs by simply appropriating goods from the companies that make them. For example, Minnesota and other states could conclude that instead of using public money to fund assistance programs for food, school supplies, or solar panels,[6] it would be more expedient to

---

[5] Needless to say, unintended consequences on issues of supply and pricing would be predictable, and may well defeat any effort to impose the full cost on manufacturers in the long-term. *See generally* Fiona M. Scott Morton, *The Problems of Price Controls*, Regulation, Spring 2001, at 50, https://bit.ly/3i19Z4a.

[6] *See, e.g.*, Minn. Dep't of Human Servs., *Minnesota Food Assistance Program (MFAP)*, https://bit.ly/2EzTO06 (last visited Oct. 4, 2020) (describing Minnesota program for food benefits for certain individuals not eligible for Supplemental Nutrition Assistance Program); Jennifer Gish, *$200 State Grants for School Supplies*, Times Union (Aug. 12, 2009), https://bit.ly/3kMQbDu (describing New York "state's new program" to provide funds for books, calculators, clothes, and other school supplies); Solar Energy Indus. Ass'n, *What Rebates and Incentives Are*

require companies that produce these items to give them away for free according to a defined formula or procedure. Similarly, instead of buying books and computers for public libraries out of public funds, a state could simply require book publishers and computer manufacturers that sell their products within that state to provide a certain number of free copies of each new book title or computer model. And, as the example of books and computers illustrates, states could attempt to undermine federal patent and copyright law (which would preempt direct state-level price-setting, *see Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1374 (Fed. Cir. 2007); *Se. Pa. Transp. Auth. v. Gilead Sci., Inc.*, 102 F. Supp. 3d 688, 702-03 (E.D. Pa. 2015)), by forcing makers of copyrighted or patented items to give away a certain amount without any compensation.[7]

Such laws might or might not result in desirable outcomes in individual cases from a policy perspective. But they are not what the Constitution contemplates or permits. "[I]t is fundamental that the Constitution requires compensation even where the conversion of private property for public use is based on a weighty public interest." *Nixon*, 978 F.2d at 1275; *see id.* at 1284 (similar). Nor can governments avoid the categorical duty to pay just compensation by reframing takings as mere

---

*Available for Solar Energy?*, https://bit.ly/3mRhxu0 (last visited Oct. 4, 2020) ("[M]any states . . . offer rebates or other incentives for solar energy technologies.").

[7] Indeed, the Act here achieves exactly that practical outcome with respect to patented insulin products.

"conditions" on the pursuit of normal business activities—a work-around that would admit to no principled limitation, and that the Supreme Court has rightly rejected. *See Horne*, 576 U.S. at 364-65; *Loretto*, 458 U.S. at 439 n.17.  Simply put, this Act requires manufacturers to give away their products without compensation, and it is unconstitutional for that reason.  Any holding to the contrary would fly in the face of binding precedent and would undermine the security of property rights not just for insulin manufacturers, but for businesses across every industry sector.

## <u>CONCLUSION</u>

The Court should grant plaintiff's motion for summary judgment.

Date: October 5, 2020

Respectfully submitted,

*/s/* Thomas H. Boyd

| | |
|---|---|
| Jeremy C. Marwell | Thomas H. Boyd, #0200517 |
|   (*pro hac vice pending*) | David A. Aafedt, #027561X |
| VINSON & ELKINS LLP | WINTHROP & WEINSTINE, P.A. |
| 2200 Pennsylvania Avenue, NW | Capella Tower | Suite 3500 |
| Suite 500 West | 225 South Sixth Street |
| Washington, DC  20037 | Minneapolis, MN 55402 |
| (202) 639-6507 | (612) 604-6400 |
| Email: jmarwell@velaw.com | Email: tboyd@winthrop.com |
| | Email: daafedt@winthrop.com |

*Counsel for Amici Curiae*