# United States Court of Appeals
## For the Eighth Circuit
_____

No. 21-1731
_____

Pharmaceutical Research and Manufacturers of America

*Plaintiff - Appellant*

v.

Stuart T. Williams; Stacey Jassey; Mary Phipps; Andrew Behm; James Bialke;
Amy Paradis; Rabih Nahas; Samantha Schirmer; Kendra Metz, all in their official
capacities as members of the Minnesota Board of Pharmacy

*Defendants - Appellees*

------------------------------

National Association of Manufacturers; Chamber of Commerce of the United
States of America; Pacific Legal Foundation; Goldwater Institute

*Amici on Behalf of Appellant(s)*

T1International; Minnesota #insulin4all; Nicole Smith-Holt; Nathan Loewy;
Cindy Boyd; Abigail Hansmeyer; Mid-Minnesota Legal Aid; National Health Law
Program

*Amici on Behalf of Appellee(s)*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: December 15, 2021
Filed: April 3, 2023
_____

Before SMITH, Chief Judge, GRUENDER and KOBES, Circuit Judges.
_____

SMITH, Chief Judge.

Pharmaceutical Research and Manufacturers of America (PhRMA) appeals the District of Minnesota's dismissal order entered in favor of the members of the Minnesota Board of Pharmacy (Board)[1] based on a lack of standing. PhRMA's lawsuit alleged a Fifth Amendment Takings Clause claim challenging the Alec Smith Insulin Affordability Act (Act). The Act, enforced by the Board members, requires, among other things, that pharmaceutical companies provide certain prescription medications to qualifying applicants at no cost.

On June 30, 2020, PhRMA filed this suit on behalf of itself and three of its members—Eli Lilly and Company, Novo Nordisk Inc., and Sanofi—that manufacture most of the insulin sold in the United States and are subject to the Act. PhRMA alleged that the Act's provisions violate the Takings Clause of the Fifth Amendment.[2] PhRMA sued the Board members, in their official capacities, under 42 U.S.C. § 1983 and *Ex Parte Young*, 209 U.S. 123 (1908), seeking (1) a declaration that the Act is unconstitutional, and (2) an injunction barring its enforcement.

_____

[1]The Board members are Stuart Williams, Stacey Jassey, Mary Phipps, Andrew Behm, James Bialke, Amy Paradis, Rabih Nahas, Samantha Schirmer, and Kendra Metz.

[2]PhRMA also argued that at least one of the Act's exemptions violates the Commerce Clause. We need not address this claim, as PhRMA concedes the claim is moot.

-2-

The Board members moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. PhRMA moved for summary judgment and conditional leave to file a supplemental complaint. The district court granted the Board members' motion to dismiss for lack of standing, denied PhRMA's motion for leave to file a supplemental complaint, denied PhRMA's motion for summary judgment as moot, and dismissed the case without prejudice. This appeal ensued.

## I. *Background*
### A. *Factual Background*

Under the Act, manufacturers must provide insulin for free to Minnesota residents who meet certain criteria. *See* Minn. Stat. § 151.74, subdiv. 1(a). This "[i]nsulin safety net program" consists of two parts: the "Continuing [S]afety [N]et [P]rogram, *id.* § 151.74, subdiv. 4, and the "[U]rgent-[N]eed [S]afety [N]et [P]rogram," *id.* § 151.74, subdiv. 2.

Under the Continuing Safety Net Program*,* manufacturers are mandated to provide any eligible individual with free insulin products. Manufacturers are tasked with reviewing applications to determine whether applicants meet the eligibility criteria. *Id.* § 151.74, subdiv. 5(a) ("Upon receipt of an application for the manufacturer's patient assistance program, the manufacturer shall process the application and determine eligibility."). The manufacturer must then notify the applicant within ten business days of its decision. *Id.* If a manufacturer denies the products, applicants may appeal to a review panel created by the State's Board of Pharmacy. *Id.* The review panel is empowered to overrule manufacturers with binding decisions. *Id.* § 151.74, subdiv. 8.

If a manufacturer determines that an applicant is eligible, it must "provide the individual with an eligibility statement or other indication that the individual has been determined eligible for the manufacturer's patient assistance program." *Id.* § 151.74,

-3-

subdiv. 5(b). An individual with an eligibility statement may present it to a pharmacy to obtain free insulin for up to one year. *Id.*

A manufacturer must provide an eligible applicant who does not have private insurance with an eligibility statement. *Id.* But

> [i]f the eligible individual has prescription drug coverage through an individual or group health plan, the manufacturer may determine that the individual's insulin needs are better addressed through the use of the manufacturer's co-payment assistance program, in which case, the manufacturer shall inform the individual and provide the individual with the necessary coupons to submit to a pharmacy. In no instance shall an eligible individual be required to pay more than the co-payment amount specified under subdivision 6, paragraph (e).

*Id.* § 151.74, subdiv. 5(c).

Once an individual receives a statement of eligibility from the manufacturer, the individual must submit that statement to the pharmacy. *Id.* § 151.74, subdiv. 6(a). "Upon receipt of an individual's eligibility status, the pharmacy shall submit an order containing the name of the insulin product and the daily dosage amount as contained in a valid prescription to the product's manufacturer." *Id.* In turn, the manufacturer must "send to the pharmacy a 90-day supply of insulin . . . at no charge to the individual or pharmacy." *Id.* § 151.74, subdiv. 6(c). Likewise, "the pharmacy shall provide the insulin to the individual at no charge to the individual" and "shall not seek reimbursement for the insulin received from the manufacturer or from any third-party payer." *Id.* § 151.74, subdiv. 6(d). But "[t]he pharmacy may collect a co-payment from the individual to cover the pharmacy's costs for processing and dispensing in an amount not to exceed $50 for each 90-day supply if the insulin is sent to the pharmacy." *Id.* § 151.74, subdiv. 6(e). No portion of the co-payment goes to the manufacturer. *See id.* This process may be repeated throughout a full year of eligibility; "[u]pon receipt of a reorder from a pharmacy, the manufacturer must send

-4-

to the pharmacy an additional 90-day supply of the product . . . at no charge to the individual or pharmacy." *Id.* § 151.74, subdiv. 6(f).

Under the Urgent-Need Safety Net Program, manufacturers must provide a 30-day supply of free insulin to individuals who meet eligibility criteria. *Id.* § 151.74, subdiv. 2(a)–(b). "Upon receipt of a completed and signed application, the pharmacist shall dispense the prescribed insulin in an amount that will provide the individual with a 30-day supply." *Id.* § 151.74, subdiv. 3(c). After dispensing the insulin, "[t]he pharmacy may submit to the manufacturer of the dispensed insulin product or to the manufacturer's vendor a claim for payment." *Id.* § 151.74, subdiv. 3(d). The manufacturer then has the options of either "reimburs[ing] the pharmacy in an amount that covers the pharmacy's acquisition cost" or "send[ing] to the pharmacy a replacement supply of the same insulin as dispensed in the amount dispensed." *Id.* Although not required, a pharmacy may collect an insulin co-payment form from the individual not exceeding $35.00 for the 30-day supply. *Id.* § 151.74, subdiv. 3(e). "But as with the Continuing Safety Net Program, none of that co-payment goes to the manufacturer that is required to provide the free insulin (or its monetary equivalent) to the pharmacy." R. Doc. 1, at ¶ 74.

The Board of MNSure[3] may assess penalties if manufacturers fail to comply with the programs and other statutory requirements. Minn. Stat. § 151.74, subdiv. 10(a)–(b). All insulin manufacturers are subject to the Act's requirements unless one

---

[3]MNSure is "a Minnesota-made health insurance marketplace." MNSure, https://www.mnsure.org/about-us/index.jsp (last visited Jan. 20, 2023). Members of the MNSure board of directors were originally defendants in this case but "[t]he parties stipulated to the dismissal of [the] defendants." R. Doc. 81, at 2 n.1.

-5-

of two exceptions applies.[4] Neither of the two limited exemptions applies to PhRMA's members selling insulin in Minnesota. R. Doc. 1, at ¶ 78.

### B. *Procedural Background*

PhRMA, a nonprofit corporation representing pharmaceutical companies, filed suit on behalf of itself and its members against the members of the Board who enforce the Act. According to PhRMA, the suit's purpose was "to protect interests that are germane to PhRMA's purpose because the Act directly affects PhRMA's core goals of advocating for public policies that encourage investment in pharmaceutical innovation and addressing distortions in the market for medicines." *Id.* at ¶ 13. PhRMA alleged that "[t]hree of [its] members—Eli Lilly and Company ('Lilly'), Novo Nordisk Inc., and Sanofi—manufacture most of the insulin sold in the United States, including in Minnesota, and are subject to the Act." *Id.* It further alleged that none of the claims asserted or relief requested "require[d] the participation of any individual member of PhRMA." *Id.* at ¶ 14.

PhRMA asserted that the Act goes beyond improving availability and affordability of insulin and effectively confiscates its property for government use. Specifically, PhRMA alleged that the Act transgresses the Takings Clause by compelling its members to supply insulin to its program without compensation, that "[t]he Act's unconstitutional taking of insulin manufacturers' products is of vital concern to PhRMA and its members, and [that] several of PhRMA's members are subject to and directly harmed by the Act." *Id.* at ¶ 13. PhRMA sought declaratory and injunctive relief. *See id.* at ¶ 9 ("Because the Act effects a repeated and continuous series of unconstitutional *per se* takings, includes no mechanism to

---

[4]"[M]anufacturer[s] with an annual gross revenue of $2,000,000 or less from insulin sales in Minnesota" are exempt under the Act. *Id.* § 151.74, subdiv. 1(c). Insulin products are exempt if the wholesale acquisition cost is $8 or less per milliliter or applicable National Council for Prescription Drug Plan billing unit, for the entire assessment time period, adjusted. *Id.* § 151.74, subdiv. 1(d).

-6-

compensate manufacturers for those takings, and, by its very design and purpose, forecloses any compensation, its enforcement should be enjoined."); *id.* at ¶ 85 ("[A] continuous series of state court actions seeking to compel an inverse condemnation proceeding for each of the thousands of units of insulin that PhRMA's members must provide under the Act is not an appropriate or available remedy. Instead, the proper redress is an injunction against enforcement of the Act, which would also afford Minnesota the opportunity to repeal its law and reverse the unconstitutional taking."); *id.* at 28 (requesting "[a] declaration that Subdivisions 3(d) and 6(f) of Minn. Stat. [§] 151.74 violate the Takings Clause of the Fifth Amendment (applicable to the states under the Fourteenth Amendment)").

In response, the Board members moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. Further, the Board members maintained that the Supreme Court foreclosed prospective injunctive and declaratory relief for takings claims in *Knick v. Township of Scott*, 139 S. Ct. 2162, 2179 (2019). PhRMA then moved for summary judgment and conditional leave to file a supplemental complaint.

The district court dismissed the action after concluding that it lacked subject matter jurisdiction because PhRMA failed to establish standing. Specifically, the court determined that PhRMA could not meet the redressability element of a standing analysis. The court deemed it unlikely that PhRMA could show it could have its injury redressed by a favorable decision. The district court noted that just compensation is legally available in Minnesota for the taking alleged by PhRMA through inverse condemnation actions in state court.[5]

---

[5]According to the district court order, an inverse condemnation action may be brought through a mandamus action when the government takes property without formally invoking its eminent domain powers. *Pharm. Rsch. & Mfrs. of Am. v. Williams*, 525 F. Supp. 3d 946, 951 (D. Minn. 2021) (citing *Am. Family Ins. v. City of Minneapolis*, 836 F.3d 918, 923 (8th Cir. 2016)).

-7-

The district court rejected PhRMA's argument "that equitable relief is not foreclosed because Minnesota inverse condemnation suits are inadequate for providing just compensation." *Williams*, 525 F. Supp. 3d at 952. "First," the court explained, "a 'future taking'—or a taking that has not happened yet—does not give rise to a claim under the Takings Clause." *Id.* (quoting *Knick*, 139 S. Ct. at 2171). Thus, "[t]he government does not need to compensate for property it has not yet taken." *Id.* "Second, the court [was] not convinced that bringing multiple actions impairs the ability of Minnesota's inverse condemnation procedures to adequately compensate insulin manufacturers." *Id.* As a result, the court found "Minnesota's just compensation provisions to be adequate." *Id.*

The district court also rejected PhRMA's alternative argument "that only injunctive relief is foreclosed, leaving declaratory relief as an available remedy under the Takings Clause." *Id.* According to the court, "A declaration that the Act is an unconstitutional taking would be the functional equivalent of an injunction barring enforcement." *Id.* (citing *Baptiste v. Kennedy*, 490 F. Supp. 3d 353, 391 (D. Mass. 2020) (holding that declaratory relief for a takings claim, without seeking just compensation, is the "functional equivalent of an unwarranted injunction" and is foreclosed under *Knick*)).

The district court also denied PhRMA's motion for leave to file a supplemental complaint, finding that supplementing the pleadings would be futile as PhRMA's proposed amendments would not overcome the complaint's deficiencies. Lastly, the district court found PhRMA's motion for summary judgment moot in light of the court's grant of the Board members' motion to dismiss.

## II. *Discussion*

PhRMA asks this court to reverse the dismissal of this case for lack of standing.

-8-

A. *Standing—Redressability*

We review the issue of standing de novo. *Heglund v. Aitkin Cnty.*, 871 F.3d 572, 577 (8th Cir. 2017). "[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc*., 528 U.S. 167, 180–81 (2000) (quoting *Lujan*, 504 U.S. at 560–561).

Neither the district court nor the parties take issue with the first two standing requirements; instead, the disputed issue is redressability."Redressability requires us to examine the 'causal connection between the alleged injury and the judicial relief requested.'" *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 1001 (8th Cir. 2022) (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)). The "redressability inquiry. . . . focuses . . . on whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc*., 554 U.S. 269, 287 (2008). In other words, the plaintiff must show that "it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit." *Id.* at 273–74 (internal quotation marks omitted). "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982).

-9-

Here, the Board members assert that *Knick* forecloses prospective injunctive and declaratory relief for a takings claim; therefore, PhRMA's takings claim is not redressable. PhRMA counters that *Knick* does not foreclose such relief in this case because the state law remedies are inadequate.

"The Takings Clause of the Fifth Amendment states that 'private property [shall not] be taken for public use, without just compensation.'" *Knick*, 139 S. Ct. at 2167 (alteration in original) (quoting U.S. Const. amend. V). "Typically, a lawsuit alleging that a plaintiff 'suffered a violation of his Fifth Amendment rights' is redressable through compensation." *Pavlock v. Holcomb*, 35 F.4th 581, 589 (7th Cir. 2022) (quoting *Knick*, 139 S. Ct. at 2168).

In *Knick*, the Supreme Court overruled its prior holding "that a property owner whose property has been taken by a local government has not suffered a violation of his Fifth Amendment rights—and thus cannot bring a federal takings claim in federal court—until a state court has denied his claim for just compensation under state law." 139 S. Ct. at 2167 (citing *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985)). In overruling the state-litigation requirement, the Court recognized that "[a] property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it" but noted that its statement did "not mean that the government must provide compensation in advance of a taking or risk having its action invalidated: So long as the property owner has some way to *obtain compensation after the fact*, governments need not fear that courts will enjoin their activities." *Id.* at 2167–68 (emphasis added).

In addressing the availability of equitable relief to prevent a taking from occurring, the Court acknowledged that

> [t]oday, because the federal and nearly all state governments provide *just compensation remedies* to property owners who have suffered a taking, *equitable relief is generally unavailable*. As long as an *adequate*

-10-

provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking. But that is because . . . such a procedure is a *remedy* for a taking that violated the Constitution, not because the availability of the procedure somehow prevented the violation from occurring in the first place.

*Id.* at 2176–77 (emphases added).

In summary, the Court "conclude[d] that a government violates the Takings Clause when it takes property without compensation, and . . . a property owner may bring a Fifth Amendment claim under § 1983 at that time." *Id.* at 2177. But, the Court cautioned, "[t]hat does not as a practical matter mean that government action or regulation may not proceed in the absence of contemporaneous compensation. Given the availability of post-taking compensation, barring the government from acting will *ordinarily* not be appropriate." *Id.* (emphasis added). The Court explained that its "holding that uncompensated takings violate the Fifth Amendment will not expose governments to new liability; it will simply allow into federal court takings claims that otherwise would have been brought as inverse condemnation suits in state court." *Id.* at 2179. It urged governments not to "fear that [its] holding will lead federal courts to invalidate their regulations as unconstitutional. As long as just compensation remedies are available—as they have been for nearly 150 years—injunctive relief will be foreclosed." *Id.*

The Board members contend that *Knick* "repeatedly assured governments that the federal courts would not invalidate the governments' regulations as unconstitutional under the Takings Clause." Appellees' Br. at 15. But *Knick* does not hold that *every* state's compensation remedy is adequate in a particular situation; implicit in *Knick* is the requirement that just compensation must be available to petitioners seeking a remedy. *See id.* at 2176. *Knick* states that "equitable relief is generally unavailable" "to property owners who have suffered a taking" "[a]s long as an *adequate* provision for obtaining just compensation exists." *Id.* (emphasis added).

-11-

Determining the adequacy of a state remedy is crucial to the redressability component of the standing analysis. Thus, to determine whether equitable relief is available to a property owner asserting a takings claim, a court must "identify[] any alternative cause of action" and "examin[e] the adequacy thereof." *Va. Hosp. & Healthcare Ass'n v. Kimsey*, No. 20-2176, 2022 WL 604049, at *5 (4th Cir. Mar. 1, 2022) (unpublished).

Here, the district court concluded that "just compensation remedies are available in Minnesota through inverse condemnation actions in state court," *Williams*, 525 F. Supp. 3d at 951, and that "Minnesota's just compensation provisions [are] adequate," *id.* at 952, thereby defeating the redressability prong of standing. *See also Am. Family Ins.*, 836 F.3d at 923 ("In Minnesota, a property owner has a cause of action for inverse condemnation when the government has taken property without formally invoking its eminent-domain powers."). PhRMA recognizes that "[i]n most cases, a state-law inverse condemnation action satisfies [*Knick*'s] requirement" that a "plain, adequate, and complete remedy at law" exist to render "injunctive relief . . . unavailable." Appellant's Br. at 25 (quoting *Knick*, 139 S. Ct. at 2175). But it argues that an inverse condemnation is *not* an adequate remedy here because that remedy "can provide just compensation only for takings that have already occurred," while "the Act authorizes a repetitive (and essentially endless) series of new, *per se* takings" that require "manufacturers [to] repeatedly bring new suits to obtain just compensation for all the insulin taken by the Act." *Id.*

The Supreme Court has long held "[t]hat a suit in equity does not lie where there is a plain adequate and complete remedy at law . . . . But the legal remedy must be as complete, practical and efficient as that which equity could afford." *Terrace v. Thompson*, 263 U.S. 197, 214 (1923); *see also United States v. Union Pac. Ry. Co.*, 160 U.S. 1, 51 (1895) ("In *Boyce v. Grundy*, 3 Pet. 210, 215, this court said: 'It is not enough that there is a remedy at law. It must be paid and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the

-12-

remedy in equity.'"). "The circumstances of each case must determine the application of the rule." *Union Pac. Ry. Co.*, 160 U.S. at 51. "[S]omething more than a theoretical inadequacy of legal remedy must exist in order to justify the issuance of [equitable relief] . . . ." *Equitable Life Assur. Soc. of U.S. v. Wert*, 102 F.2d 10, 15 (8th Cir. 1939).

Equity courts are not forbidden from exercising jurisdiction, but the record must show "a practical inadequacy of remedy sufficient to justify a court of equity in exercising its jurisdiction in favor of a plaintiff whose rights will be substantially and adversely affected if such [equitable relief] is not granted." *Id.* "To oust jurisdiction in equity the remedy at law must be so complete that it attains the full end and justice of the case, reaching the whole mischief and securing the whole right of the party in a perfect manner at the present time and in the future." *Wash. Univ. v. Baumann*, 108 S.W.2d 403, 412 (Mo. 1937) (en banc) (quoting *Pocoke v. Peterson*, 165 S.W. 1017, 1022 (Mo. 1914)); *see also* 1 Story's Equity (14th ed.) § 33, p. 31; 1 Pomeroy's Eq. Juris. (4th ed.) § 176, p. 225, § 180, p. 238.

Forcing a party to engage in repetitive lawsuits indefinitely seems to be precisely the sort of legal inadequacy that would make equitable relief an available and preferred method of redress. "An inadequacy of legal remedy exists where one is bound to litigate a *multiplicity of suits* having a community of facts and issues." *Wert*, 102 F.2d at 14 (citing *Hale v. Allison*, 188 U.S. 56, 71 (1903); *Di Giovanni v. Camden Fire Ins. Ass'n*, 296 U.S. 64, 70 (1935)); *see also* 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2944 (3d ed. 2013) (stating that "[t]he legal remedy may be deemed inadequate . . . . if plaintiff demonstrates that effective legal relief can be secured only by a multiplicity of actions, as, for example, when the injury is of a continuing nature, so that plaintiff would be required to pursue damages each time plaintiff was injured, equitable relief will be deemed appropriate" (footnotes omitted)). "[Professor John Norton] Pomeroy, in his work on Equity Jurisprudence, in vol. 1, §§ 243–275, discusses at length the reasons upon which rests

-13-

the doctrine that jurisdiction exists in equity courts to prevent a multiplicity of suits." *Ill. Cent. R. Co. v. Baker*, 159 S.W. 1169, 1171 (Ky. 1913). He identified "four classes of cases in which, in his opinion, it ought to be exercised." *Id.* One of those classes of cases is

> [w]here from the nature of the wrong, and from the settled rules of the legal procedure, the same injured party, in order to obtain all the relief to which he is justly entitled, is obliged to bring a number of actions against the same wrongdoer, all growing out of the one wrongful act and involving similar questions of fact and of law.

*Id.* (internal quotation marks omitted). In such cases, "[a] court of equity interferes because the plaintiff would be obliged to bring a succession, perhaps an indefinite number, of actions at law in order to obtain relief appearing even to be sufficient." *Hower v. Garrett*, 18 Pa. D. 847, 848–49 (Pa. Com. Pl. 1908) (quoting 1 John Norton Pomeroy, *Pomeroy's Equity Jurisprudence and Equitable Remedies: A Treatise on Equity Jurisprudence* § 252, 382 (3d ed. 1905)). This is because "the. . . wrong complained of . . . [is] in its very nature continuous." *Id.* at 849 (quoting Pomeroy, *supra*, at § 252, 382).

Consistent with Professor Pomeroy's view, the Supreme Court has recognized that "[a]voidance of the burden of numerous suits at law between the same or different parties, where the issues are substantially the same, is a recognized ground for equitable relief in the federal courts." *Wert*, 102 F.2d at 14 (quoting *Di Giovanni*, 296 U.S. at 70); *see also Ogden City v. Armstrong*, 168 U.S. 224, 237–38 (1897) ("Not only, however, was there a want of an adequate remedy in proceeding by a writ of certiorari, but we think equitable jurisdiction was properly invoked to prevent a multiplicity of suits, and also to relieve the plaintiffs from a cloud upon their title."); *Union Pac. Ry. Co.*, 160 U.S. at 51 (recognizing that a "remedy at law was not as effectual as in equity" where "a 'direct proceeding in equity w[ould] save time,

-14-

expense, and a *multiplicity of suits*, and settle finally the rights of all concerned in one litigation'" (emphasis added) (quoting *Oelrichs v. Spain*, 82 U.S. 211, 228 (1872))).[6]

The Court's decision in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998) (plurality opinion), gives guidance as to when equitable relief is available for a takings claim. The case involved "a [former coal operator's] challenge under the Due Process and Takings Clauses of the Constitution to the . . . Coal Act . . ., which establishe[d] a mechanism for funding health care benefits for retirees from the coal industry and their dependents." *Id.* at 503–04. Under the Coal Act, former employers had to pay annual assessments to fund the health care benefits for the retired mineworkers. *Id.* at 514–15. A "threshold jurisdictional question" in the case was "[w]hether [the coal operator's] takings claim was properly filed in Federal District Court rather than the United States Court of Federal Claims." *Id.* at 519.

A plurality of the Court recognized that "a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." *Id.* at 520. But, the plurality noted, the coal operator did "not seek compensation from the Government. Instead, [it] request[ed] a *declaratory judgment* that the Coal Act violates the Constitution and a corresponding injunction against the Commissioner's enforcement of the Act as to [the coal operator]." *Id.* (emphasis

---

[6]The Board members rely in part on *Hurley v. Kincaid*, 285 U.S. 95 (1932), in arguing that "[t]akings are unique because any illegality under the Fifth Amendment is confined to the failure to compensate for a taking; meaning that equitable relief is foreclosed if compensation is available." Appellees' Br. at 26 (citing *Hurley*, 285 U.S. at 104). *Hurley* did not involve a multiplicity of suits; instead, it involved a single taking. *See Hurley*, 285 U.S. at 104 ("For even if the defendants are acting illegally, under the act, in threatening to proceed without first acquiring flowage rights over the complainant's lands, the illegality, on complainant's own contention, is confined to the failure to compensate him for the taking, and affords no basis for an injunction if such compensation may be procured in an action at law.").

-15-

added). According to the plurality, this type of relief was "arguably not within the jurisdiction of the Court of Federal Claims under the Tucker Act." *Id.* Some circuit courts had "concluded that a claim for equitable relief under the Takings Clause is hypothetical, and therefore not within the district courts' jurisdiction, until compensation has been sought and refused in the Court of Federal Claims." *Id.* The plurality acknowledged that the "Court's precedent c[ould] be read to support the . . . conclusion that regardless of the nature of relief sought, the availability of a Tucker Act remedy renders premature any takings claim in federal district court." *Id.* at 521.

Ultimately, however, the plurality concluded that "in a case such as this one, it cannot be said that monetary relief against the Government is an available remedy." *Id.* The plurality offered two reasons for its conclusion. First, the Coal Act mandated that the former employers make the payments "to the privately operated Combined Fund," not to the government. *Id.* The plurality reasoned that Congress "could not have contemplated that the Treasury would compensate coal operators for their liability under the Act, for every dollar paid pursuant to a statute would be presumed to generate a dollar of Tucker Act compensation." *Id.* (cleaned up). Because the Coal Act, "rather than burdening real or physical property, require[d] a direct transfer of funds mandated by the Government," the plurality determined that "the presumption of Tucker Act availability" was inapplicable. *Id.* (internal quotation marks omitted). "In that situation, a claim for compensation would entail an *utterly pointless set of activities*." *Id.* (emphasis added) (internal quotation marks omitted). Instead, the plurality explained, "the Declaratory Judgment Act 'allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained.'" *Id.* (quoting *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 71 n.15 (1978)).

-16-

Second, the plurality noted that "in situations analogous to this case, [the Court] ha[s] assumed the lack of a compensatory remedy and ha[s] granted equitable relief for Takings Clause violations without discussing the applicability of the Tucker Act." *Id.* (citing cases). And the plurality further pointed to the Court's upholding of "similar statutory schemes against Takings Clause challenges" without any discussion of "the basis of th[e] Court's jurisdiction." *Id.* at 522 (citing cases). "Based on the nature of the taking alleged in this case, [the plurality] conclude[d] that the declaratory judgment and injunction sought by [the coal operator] constitute[d] an appropriate remedy under the circumstances, and that it [was] within the district courts' power to award such equitable relief." *Id.*

Having considered the relevant case law, we hold that in the specific context of this case, Minnesota's inverse condemnation procedure does not afford insulin manufacturers an adequate remedy for the repetitive series of alleged[7] takings under the Act.[8] Such an action is an inadequate legal remedy because PhRMA's members would be "bound to litigate a multiplicity of suits" to be compensated. *Wert*, 102 F.2d

---

[7]In its complaint, "PhRMA allege[d] that the Act compels its members to give away insulin without compensation in violation of the Takings Clause." *Williams*, 525 F. Supp. 3d at 951. Like the district court we "accept[] the factual allegations in the pleadings as true and view[] the facts in the light most favorable to the nonmoving party" on a motion to dismiss for lack of subject matter jurisdiction. *Id.* at 950 (citing *Hastings v. Wilson*, 516 F.3d 1055, 1058 (8th Cir. 2008); *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) ("[T]he non-moving party receives the same protections [for facial attacks under Rule 12(b)(1)] as it would defending against a motion brought under Rule 12(b)(6).")).

[8]As PhRMA points out, our prior cases *do not* hold "that Minnesota's inverse condemnation procedure is an adequate remedy for *all* conceivable takings." Appellant's Reply Br. at 5 & n.2 (citing *Foster v. Minnesota*, 888 F.3d 356 (8th Cir. 2018); *Am. Family Ins.*, 836 F.3d at 923; *Cormack v. Settle-Beshears*, 474 F.3d 528, 531 (8th Cir. 2007); *Koscielski v. City of Minneapolis*, 435 F.3d 898, 903–04 (8th Cir. 2006); *Kottschade v. City of Rochester*, 319 F.3d 1038 (8th Cir. 2003)).

-17-

at 14. Contrary to the Board members' argument, the imminence of multiple suits is not hypothetical or speculative. The Act itself provides that, under the Continuing Safety Net Program, "[e]ach manufacturer shall make a patient assistance program available" to provide insulin products to any Minnesota resident who meets the eligibility requirements. Minn. Stat. § 151.74, subd. 4. Under the Act's Urgent-Need Safety Net Program, manufacturers must provide a 30-day supply of free insulin to Minnesota residents who meet the eligibility requirements. *Id.*, subd. 2. A manufacturer who fails to comply with the Act's requirements is subject to a penalty of $200,000 per month. *Id.*, subd. 10(a)–(b). The penalty increases to $600,000 per month if the manufacturer is noncompliant after one year. *Id.*, subd. 10(a). The Act's Urgent-Need Safety Net Program has no expiration date, and the Continuing Safety Net Program will remain in effect through at least 2024. *See id.*, subd.16(b) ("Subdivisions 4 to 6, 8, and 9 expire December 31, 2024, unless the legislature affirmatively determines the need for the continuation of the long-term safety net program described in subdivisions 4 to 6.").

In these circumstances, the legal remedy of damages is not "complete, practical and efficient," *Terrace*, 263 U.S. at 214, because it requires a repetitive succession of inverse condemnation suits. An inverse condemnation action to reimburse a manufacturer for each discrete alleged taking is incapable of compensating the manufacturers for the repetitive, future takings that will occur under the Act's requirements. By contrast, equitable relief would protect manufacturers from those future harms.

The plurality opinion in *Apfel* buttresses our conclusion that Minnesota's inverse condemnation procedure does not afford insulin manufacturers an adequate remedy for the repetitive series of alleged takings under the Act. True, *Apfel* involved the transfers of funds—not property such as insulin—from the coal operator to privately operated fund. *See Apfel*, 524 U.S. at 521 ("[T]he presumption of Tucker Act availability must be reversed where the challenged statute, rather than burdening

-18-

real or physical property, requires a direct transfer of funds mandated by the Government." (internal quotation marks omitted)). "But," as PhRMA points out, "when a manufacturer (1) reimburses a pharmacy the cost of insulin, then (2) sues to recover that money as just compensation, it is seeking the same 'dollar-for-dollar' compensation deemed pointless in *Apfel*." Appellant's Reply Br. at 15–16; *cf. Apfel*, 524 U.S. at 521 ("Congress could not have contemplated that the Treasury would compensate coal operators for their liability under the Act, for every dollar paid pursuant to a statute would be presumed to generate a dollar of Tucker Act compensation." (cleaned up)). In both *Apfel* and the present case, requiring an entity to submit repetitive takings claims "would entail an utterly pointless set of activities," as every dollar paid would then entitle that entity to seek compensation for the same amount. *Apfel*, 524 U.S. at 521 (internal quotation marks omitted).[9]

---

[9]Nonetheless, the Board members insist that the Supreme Court and other courts have "rejected equitable relief when continuous takings were alleged." Appellees' Br. at 19 (citing cases). These cases are distinguishable, however, because in each case a single action could compensate for the alleged taking. *See Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 136 (1974) (holding that remedies under the Tucker Act were available to provide just compensation for any "erosion taking" under the Rail Act to cover any shortfall between the consideration that the railroads receive for rail properties finally conveyed under the Rail Act and the constitutional minimum); *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1266 (Fed. Cir. 2009) (holding that egg producer who brought suit claiming the United States Department of Agriculture regulations that restricted egg sales from its farms and caused the loss of egg-laying chickens that tested positive for the presence of salmonella bacteria did not suffer a compensable regulatory taking and reversing district court's "rul[ing] that the severity of the economic impact favored [the egg producer] because it suffered a diminution in profit of 219%" and holding that the egg producer "suffered a taking" and was entitled to "just compensation" for the alleged taking in the single action); *Nat'l Fuel Gas Distrib. Corp. v. N.Y. State Energy Rsch. & Dev. Auth.*, 265 F. Supp. 3d 286, 293 (W.D.N.Y. 2017) ("Plaintiff asserts that NYSERDA, DOE, and Perry have effectuated *a taking* by refusing Plaintiff access to *the pipeline*, thereby destroying Plaintiff's right to possess, use and dispose of *the pipeline*." (emphases added) (cleaned up)).

-19-

Accordingly, we hold that the district court erred in concluding that PhRMA lacks standing to seek injunctive relief and declaratory relief to redress violations of the Takings Clause. Minnesota's inverse condemnation procedure does not afford the insulin manufacturers an adequate remedy.

### B. *Associational Standing*

As an alternative ground for affirmance, the Board members argue that PhRMA lacks associational standing.[10]

> [A]n association has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Kuehl v. Sellner*, 887 F.3d 845, 851 (8th Cir. 2018) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The Board members argue that "PhRMA . . . fails the third prong of this test, because its claim stems from the manufacturers' property interests, and their participation is required to provide the factual context needed to resolve that claim." Appellees' Br. at 37. According to the Board members, "[a] takings claim is generally a 'poor candidate' for associational standing" for two main reasons. *Id.* (quoting *Rent Stabilization Ass'n of N.Y.C., Inc. v. Dinkins*, 805 F. Supp. 159, 164 (S.D.N.Y. 1992)). "First," they argue, "the remedy for a taking is providing the owner with just

---

[10]The district court declined to address this argument based on its conclusion that "injunctive and equitable relief are unavailable for PhRMA's takings claim." *Williams*, 525 F. Supp. 3d at 951 n.4.

-20-

compensation, which 'necessarily requires the participation of the individual members' to determine the amount of compensation due." *Id.* at 37–38 (quoting *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 850 (9th Cir. 2001)). "Second," they maintain, "resolving a takings claim is a 'difficult, fact specific inquiry.'" *Id.* at 38 (quoting *Dinkins*, 805 F. Supp. at 164). The Board members further assert that "[n]umerous courts have held that associations lack standing to bring as-applied takings claims, even when seeking only declaratory or injunctive relief." *Id.* at 39 (citing *Rent Stabilization Ass'n of N.Y.C. v. Dinkins*, 5 F.3d 591, 596–97 (2d Cir. 1993); *Wash. Legal Found.*, 271 F.3d at 849–50; *Ga. Cemetery Ass'n, Inc. v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003) (per curiam); *Comm. for Reasonable Regul. of Lake Tahoe v. Tahoe Reg'l Plan. Agency*, 365 F. Supp. 2d 1146, 1163–64 (D. Nev. 2005); *Pharm. Care Mgmt. Ass'n v. Gerhart*, No. 4:14-cv-000345, 2015 WL 6164444, at *7–8 (S.D. Iowa Feb. 18, 2015), *rev'd on other grounds*, 852 F.3d 722 (8th Cir. 2017)).

The Takings Clause "provide[s] protection . . . against a direct appropriation of property—personal or real," as well as against "a 'regulatory taking'—a restriction on the use of property that [goes] 'too far.'" *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015) (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1992)). "[A] physical *appropriation* of property [gives] rise to a *per se* taking, without regard to other factors." *Id.* By contrast, the test for determining whether a regulatory taking occurs "require[s] an 'ad hoc' factual inquiry. That inquiry require[s] considering factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id.* Supreme Court precedent "ha[s] stressed the 'longstanding distinction' between government acquisitions of property and regulations." *Id.* at 361 (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 323 (2002)). "The essential question" in determining whether a taking is a regulatory taking or a physical taking "is whether the government has physically taken property

-21-

for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021). "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred . . . ." *Id.*

The present case involves an allegation of a *physical* taking of insulin, not a *regulatory* taking. Under *Horne*, this type of taking is "a *per se* taking" that does not require a court to analyze other factors. 576 U.S. at 360. By contrast, the cases that the Board members rely on in arguing that PhRMA lacks associational standing involve *regulatory* takings, which require individualized inquiries necessitating the participation of the individual members.[11]

---

[11] *See Cox*, 353 F.3d at 1322 (holding association of private, for-profit cemetery owners lacked standing to challenge the constitutionality of a state statute exempting church, fraternal, and community cemeteries from rules and regulations imposed upon other cemeteries absent a showing that all of its members were currently charging in excess of the statutory limits); *Wash. Legal Found.*, 271 F.3d at 849–50 (holding that a public-interest law and policy center lacked representational standing to challenge the use of some members funds to support an IOLTA program as a taking without just compensation under the Fifth Amendment after concluding that determining just compensation would necessarily require the participation of the individual members); *Comm. For Reasonable Regul. of Lake Tahoe*, 365 F. Supp. 2d at 1163 (holding homeowners' group lacked associational standing to challenge adoption by city planning agency of scenic review ordinance regulating appearance of residential housing on littoral and shoreland properties because application of the ordinance would have presented fact-specific situations to each homeowner, and investment-backed expectations and economic impact would have differed among homeowners); *Gerhart*, 2015 WL 6164444, at *7 ("Therefore, even if the Court can determine that Plaintiff has alleged facts sufficient to establish that Plaintiff's members MAC methodology could constitute a trade secret, determination of whether compelled revelation of the methodology constitutes a taking would require a more intensive factual inquiry."); *Dinkins*, 805 F. Supp. at 164 (holding association of owners of rent-stabilized property lacked standing to challenge control law as applied to its individual members because the economic impact of the law and its interference with

-22-

Furthermore, PhRMA's request for equitable relief does not defeat associational standing. An "organization lacks standing to assert claims of injunctive relief on behalf of its members where 'the fact and extent' of the injury that gives rise to the claims for injunctive relief 'would require individualized proof,' or where 'the relief requested [would] require[] the participation of individual members in the lawsuit.'" *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) (alterations in original) (first quoting *Warth v. Sedin*, 422 U.S. 490, 515–16 (1975), then quoting *Hunt v. Wash. State Apple Adv. Comm'n*, 432 U.S. 333, 343 (1977)). Again, individualized proof is not needed to show that the Act requires the taking of the insulin.

In summary, this case involves an allegation of a physical, *per se* taking with a request for equitable relief, neither of which "require[] the participation of individual members in the lawsuit." *Kuehl*, 887 F.3d at 851 (quoting *Hunt*, 432 U.S. at 343).

## C. *Sovereign Immunity*

Finally, as another alternative ground for affirmance, the Board members contend that its members are immune from suit under the Eleventh Amendment.[12]

"Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Whole Woman's Health v.*

---

reasonable investment-backed expectations varied from owner to owner and the source of the claim was primarily in application of rent stablization process to some, but less than all, of the association's members).

[12]As with associational standing, the district court declined to address this argument based on its conclusion that "injunctive and equitable relief are unavailable for PhRMA's takings claim." *Williams*, 525 F. Supp. 3d at 951 n.4.

-23-

*Jackson*, 142 S. Ct. 522, 532 (2021).[13] But "a narrow exception . . . allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law." *Whole Woman's Health*, 142 S. Ct. at 532 (citing *Ex Parte Young*, 209 U.S. 123, 159–60 (1908)). "Under the exception established in *Ex Parte Young*, . . . a private party may sue state officials in their official capacities for prospective injunctive relief." *McDaniel v. Precythe*, 897 F.3d 946, 951–52 (8th Cir. 2018). "In determining whether the doctrine of *Ex Parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief property characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (cleaned up).

The Board members argue that "*Ex Parte Young*'s narrow immunity exception is inapplicable to PhRMA's claim because takings claims necessarily involve the state as the real, substantial party in interest, and because such an order would interfere with the state's special sovereignty interest to take private property for a public

---

[13] "*Knick* did not address sovereign immunity, as it involved a suit against a town." *Zito v. N.C. Coastal Resources Comm'n*, 8 F.4th 281, 286 (4th Cir. 2021) (citing *Jinks v. Richland Cnty.*, 538 U.S. 456, 466 (2003) ("[M]unicipalities, unlike States, do not enjoy a constitutionally protected immunity from suit.")). To date, "every circuit to address *Knick*'s effect on sovereign immunity has concluded that *Knick* did not abrogate State sovereign immunity in federal court." *Id.* at 287 (citing *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1214 (10th Cir. 2019) ("But *Knick* did not involve Eleventh Amendment immunity, which is the basis of our holding in this case."); *Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456–57 (5th Cir. 2019) ("Nor does anything in *Knick* even suggest, let alone require, reconsideration of longstanding sovereign immunity principles protecting states from suit in federal court."); *Ladd v. Marchbanks*, 971 F.3d 574, 579 (6th Cir. 2020) ("[T]he Court's opinion in *Knick* says nothing about sovereign immunity.")).

-24-

purpose." Appellees' Br. at 41. It concludes that "public officials are immune from suits in federal court seeking just compensation or inverse condemnation, despite the *Ex Parte Young* exception." *Id.* at 42.

The Board members primarily rely upon *Ladd*. In that case, property owners brought suit against Ohio and the director of its department of transportation in his official capacity, asserting a takings claim and seeking a declaratory judgment that flooding caused by the department's construction project changed topography and constituted a taking of private property without just compensation. 971 F.3d at 576. The Sixth Circuit affirmed the district court's dismissal of the complaint. The court determined that the property owners were actually seeking "an injunction requiring the payment of funds from the State's treasury," which is prohibited under *Ex Parte Young*. *Id.* at 581 (quoting *Va. Office for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256–57 (2011)). Specifically, the property owners in *Ladd* had requested that the court direct the state official "to initiate eminent domain proceedings in state court." *Id.* at 581 (internal quotation marks omitted). A favorable outcome of such a proceeding would result in "a compensation award that Ohio's treasury must pay" if the property owners prevailed. *Id.* "So," the court explained, "[the property owners] seek an order they can use to require Ohio to pay them for its alleged taking of their property—the exact type of claim *Stewart* tells us isn't a proper workaround to the States' sovereign immunity." *Id.* (citing *Stewart*, 563 U.S. at 256–57). Furthermore, the property owners' complaint failed to "allege[] an ongoing violation of federal law and seek[] relief properly characterized as prospective." *Id.* (quoting *Verizon*, 535 U.S. at 645). Instead of "seek[ing] an injunction barring [the state official] from any further construction that would damage their property," the property owners sought "compensation for the damage they allege[d] the Ohio Department of Transportation *already caused*." *Id.* As a result, the court concluded that sovereign immunity barred the property owners' claim for declaratory judgment. *Id.*

-25-

Here, by contrast, "[t]he [Board's] status as an arm of the State would not prevent us from enjoining the [Board members] from future violations of the Takings Clause." *Laborers' Int'l Union of N. Am., Loc. 860 v. Neff*, 29 F.4th 325, 334 (6th Cir. 2022) (citing *Ex Parte Young*, 209 U.S. at 159–60). As previously discussed, PhRMA has already "establish[ed] . . . that it . . . has no 'adequate remedy at law'" for the alleged taking. *See id*. (quoting *Knick*, 139 S. Ct. at 2176). Unlike in *Ladd*, PhRMA has specifically requested declaratory and injunctive relief. And while the property owners in *Ladd* sought "compensation for the damage . . . *already caused*," 971 F.3d at 581, PhRMA alleged that the takings are ongoing, *see* R. Doc. 1, at 5 ("Because the Act effects a *repeated and continuous* series of unconstitutional *per se* takings, includes no mechanism to compensate manufacturers for those takings, and, by its very design and purpose, forecloses any compensation, its enforcement should be enjoined." (emphasis added)); *id.* at 26 ("[A] *continuous* series of state court actions seeking to compel an inverse condemnation proceeding for each of the thousands of units of insulin that PhRMA's members must provide under the Act is not an appropriate or available remedy. Instead, the proper redress is an injunction against enforcement of the Act, which would also afford Minnesota the opportunity to repeal its law and reverse the unconstitutional taking." (emphasis added)).

Accordingly, the *Ex Parte Young* exception is applicable, and sovereign immunity does not bar PhRMA's suit.

## III. *Conclusion*

We hold that the district court erred in dismissing PhRMA's suit for lack of standing. We likewise reject the Board members' alternative grounds for affirmance on the basis of lack of associational standing and the sovereign-immunity bar. We

-26-

reverse the judgment of the district court and remand for further proceedings consistent with this opinion.[14]

GRUENDER, Circuit Judge, concurring.

I agree that the plaintiffs have standing to sue but doubt that the question of the availability of equitable relief implicates standing.  Our opinion assumes that it does because the district court and the parties analyzed the availability of equitable relief in terms of standing.  But our sister circuit recently noted that it might not.  *Va. Hosp. & Healthcare Ass'n v. Kimsey*, No. 20-2176, 2022 WL 604049, at *4 & n.3 (4th Cir. March 1, 2022) (unpublished) ("Whether the district court's grounds for dismissing the Takings and Preemption Claims were, as the court thought, Rule 12(b)(1) issues of Article III standing—or were instead Rule 12(b)(6) issues of the viability of those Claims—is a question that we acknowledge but need not resolve today.").  And the case law suggests the same.

"Redressability does not require that the plaintiff actually be entitled to the relief sought; it is enough that the requested relief, if granted, would redress the plaintiff's injury."  *Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 731 (6th Cir. 2016); *see also Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 502 (7th Cir. 2005) ("Redressability . . . depends upon the relief requested, not the relief [the party] could prove it was entitled to on the merits.").  We have previously suggested that the issue of whether a party has an adequate remedy at law "is not one of jurisdiction but is one of the need and propriety of equitable relief."  *Terry v. New York Life Ins.*, 104 F.2d 498, 500 (8th Cir. 1939).  And we have generally addressed the availability of equitable relief as an issue related to the sufficiency of a claim rather than standing.  *See, e.g.*, *Bonner v. Circuit Court of City of St. Louis*, 526 F.2d 1331, 1335-36 (8th Cir. 1975) (en banc)

[14]We decline PhRMA's invitation to decide the merits of their claim.

(affirming the district court's dismissal of the plaintiffs' complaint, without mentioning standing, because they failed to allege a lack of an adequate remedy at law); *Birch v. Mazander*, 678 F.2d 754, 756 (8th Cir. 1982) (affirming the district court's grant of summary judgment because the plaintiff failed to establish that he was entitled to seek equitable relief).

Further, in *Cedar Point Nursery v. Hassid*, a case in which the plaintiffs sought equitable relief for an alleged Takings Clause violation, the Supreme Court did not discuss whether equitable relief was in fact available, which might suggest that the issue does not implicate standing.  594 U.S. ---, 141 S. Ct. 2063 (2021); *see also id.* at 2089 (Breyer, J., dissenting) (explaining, in a discussion of remedies, that on remand California could foreclose injunctive relief by providing damages).  Thus, I concur in the opinion with the understanding that it does not decide the question of whether the availability of equitable relief implicates standing.

_____

-28-